[Cite as *Paquin v. Indian Hill*, 2024-Ohio-6078.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| DR. JASON PAQUIN | : | APPEAL NO. C-240146 |
| and | | TRIAL NOS. A-2201397 |
| | : | A-2201398 |
| DR. JOANNA PAQUIN, | : | |
| Plaintiffs-Appellees, | | *O P I N I O N.* |
| | : | |
| vs. | : | |
| CITY OF INDIAN HILL, | : | |
| Defendant, | : | |
| and | : | |
| THE PETERLOON FOUNDATION, | : | |
| Intervenor-Appellant. | : | |

Civil Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Reversed in Part, Vacated in Part, and Cause Remanded

Date of Judgment Entry on Appeal: December 31, 2024

*Strauss Troy Co., LPA, Matthew W. Fellerhoff, Emily Supinger* and *Stephen E. Schilling*, for Plaintiffs-Appellees,

*Dinsmore & Shohl LLP, Bryan E. Pacheco* and *Richard B. Tranter*, for Intervenor-Appellant.

**KINSLEY, Judge.**

**{¶1}**  In this administrative appeal by intervenor-appellant The Peterloon Foundation ("Peterloon"), we review the decision of the Hamilton County Court of Common Pleas overturning two resolutions passed by the Indian Hill City Council ("the city council").  The first—Resolution No. 05-22—imposes guidelines for amplified music at outdoor events taking place at Peterloon's property ("the noise resolution").  The second—Resolution No. 06-22—adopts a decision by the Indian Hill Planning Commission granting Peterloon a special exception to erect a semi-permanent tent on its property ("the tent resolution").  Both resolutions were passed after plaintiffs-appellees Drs. Jason and Joanna Paquin ("the Paquins"), neighbors of Peterloon, appealed decisions by the Indian Hill Planning Commission to the city council.  The trial court invalidated both resolutions on the grounds that the city council improperly interpreted Peterloon's 1980 zoning authorization to permit certain on-site weddings.

**{¶2}**  We deal first with threshold questions of jurisdiction and mootness.  In this regard, we conclude that both this court and the common pleas court lack subject-matter jurisdiction to review the noise resolution.  As we explain in this opinion, the city council exercised legislative rather than administrative power in passing the noise resolution, taking it outside the subject-matter jurisdiction of R.C. Ch. 2506.  We accordingly vacate for lack of jurisdiction the trial court's judgment regarding the noise resolution.

**{¶3}**  We reach a different outcome with regard to the tent resolution.  We initially conclude that we have jurisdiction to review the resolution, despite the fact that it has already expired.  The tent resolution permits Peterloon to erect and remove

a semi-permanent tent by November 30, 2022, a date now approximately two years in the past. The issues raised by the tent resolution are therefore technically moot. But the record reflects that Peterloon intends to seek a similar resolution every year and in fact did so in 2023. The issues presented by the tent resolution are therefore likely to repeat on an annual basis, but evade our review, a classic exception to the doctrine of mootness. *See M.R. v. Niesen*, 2022-Ohio-1130, ¶ 11. We therefore have jurisdiction over this portion of Peterloon's appeal.

{¶4} As to the validity of the tent resolution, we conclude, as a matter of law, that the trial court improperly interpreted the planning commission's 1980 authorization. In essence, the trial court determined that the planning commission's approval permitted only "non-commercial" weddings that are "sponsored by groups." But the trial court improperly defined these terms, reaching conclusions that were not supported by either the plain meaning of the 1980 approval or ordinary principles of statutory construction. We accordingly reverse the judgment of the trial court with regard to the tent resolution and remand the matter to the trial court.

{¶5} The net effect of our decision is therefore that outdoor weddings may take place at Peterloon consistent with the terms of the noise resolution and the 1980 zoning authorization. This is not to say, however, that the manner in which those weddings are conducted and the actions of guests, vendors, and the wedding party must remain unregulated. To the contrary. The planning commission gave Peterloon permission in 1980 to use its property as the equivalent of a private golf course or country club. It did not give Peterloon permission to violate other applicable laws, to

3

permanently evade regulation, or to invade the privacy interests of its neighbors.[1] Our opinion is therefore cabined to the two specific resolutions before us and the unique land use questions they present.

## I.    *Facts and Procedural History*

{¶6}    Peterloon is the estate of the late John J. Emery. Originally built on a 1,200-acre plot, it now consists of a large historic residence and manicured gardens surrounded by 71 acres of undeveloped land.[2] Today, the Peterloon estate is operated by The Peterloon Foundation, a nonprofit organization that continues the charitable works of the Emery family.

### A.  *The 1980 and 1990 Authorizations*

{¶7}    In November of 1979, a member of the Peterloon Foundation Board of Trustees investigated what uses would be permitted at the property consistent with the Indian Hill zoning ordinance. To this end, she wrote a letter to the Indian Hill Planning Commission asking that it determine whether two proposed activities were allowed. First, Peterloon wanted to lease part of its guest wing to the Junior League for its headquarters. Second, Peterloon proposed that "other areas of the house and grounds might be used for meetings and other occasions sponsored by groups other than the Junior League."

{¶8}    The planning commission considered these proposals at its January 22, 1980 meeting. It concluded that both activities—the rental of the guest wing to the Junior League and the use of the house and grounds for meetings and other occasions

---

[1] We do not mean to suggest that Peterloon is engaged in these activities. We merely describe the limited scope of the planning commission's action in 1980. It authorized a particular use under the zoning ordinance and no more.

[2] The surrounding property has since been sold off and redeveloped into residential subdivisions.

4

sponsored by other groups—would be permitted under then-existing Paragraph 61.155 of the zoning ordinance. While the record does not contain the entirety of the zoning ordinance in effect at the time, it does reflect that Paragraph 61.155 enumerated specific land uses: "[p]rivate golf courses, lodges, clubs, country clubs, riding clubs, polo clubs, tennis courts and the like, all of a non-commercial nature."

{¶9}    Less than a year later, in December of 1980, a representative of Peterloon again appeared before the planning commission. At this meeting, the representative explained that the Peterloon estate was being rented out for social occasions and that each lessee was required to obtain a separate liquor permit in order to serve alcohol at these functions. To alleviate this problem, Peterloon sought a variance from the planning commission to obtain its own permanent liquor license. The planning commission unanimously approved the request.

{¶10} Peterloon then began hosting weddings on the property. While the record is unclear as to the precise number and nature of these events, at least one person affiliated with the Peterloon Foundation attested that she held her own wedding there in 1983.

{¶11} A decade after the 1980 authorizations, in April of 1990, Peterloon sought and obtained a special exception from the planning commission to use the property as a "place of assembly." According to Peterloon, guests who had attended functions at the property expressed an interest in touring the gardens on a more regular basis. Thus, Peterloon desired to sell memberships to the gardens to facilitate small-group garden walks. It proposed to reinvest the revenue from garden memberships into maintaining and improving the gardens.

{¶12} The planning commission granted the requested special exception, subject to two conditions: (1) the number of memberships would be capped at 200; and (2) the arrangement would reviewed be annually or at the request of Peterloon. No documents in the record suggest that the membership limitation was ever revisited.

### B. Peterloon's Neighbors and the Noise Resolution

{¶13} In 2004, planning commission minutes and other records of public hearings reveal the development of the acreage surrounding Peterloon into an upscale residential subdivision. At the time, developers noted the proximity of Peterloon to the proposed home sites and the regularity with which Peterloon hosted outdoor social gatherings. They considered this to be an asset to the proposed community, which was ultimately constructed.

{¶14} Peterloon continued to host outdoor weddings and events without serious incident until December 2020, when a resident of one of the nearby subdivisions emailed Indian Hill to complain about noise.[3] Responding to the email, the planning commission conducted a series of eight public meetings to consider information from Indian Hill administrators, Peterloon, and the community about Peterloon's operations. Dr. Jason Paquin was among the neighboring residents who spoke to the impact of weddings and events hosted by Peterloon on his family. To this end, Paquin relayed that the noise from amplified music and live music at Peterloon kept his children awake late at night. Paquin and other members of the community further indicated that Peterloon increased the intensity and frequency of weddings in 2021, leading to greater negative impacts for the surrounding residential properties.

---

[3] A neighbor complained about outdoor events at Peterloon in 2009, but was instructed by Indian Hill representatives that the organization was permitted to use the property in that manner. Nothing further came of the complaint.

6

**{¶15}** As part of its inquiry into the noise complaint, the planning commission studied the City of Cincinnati's noise ordinance. It also considered an environmental noise assessment report that measured sound transmission levels from Peterloon's outdoor stage area to adjacent property lines. Peterloon also submitted proposed noise regulations to the planning commission that would govern the location and loudness of amplified sound equipment at outdoor events.

**{¶16}** On August 17, 2021, the planning commission voted to take no action with regard to noise from outdoor events at Peterloon. In doing so, it determined that the planning commission had issued a special exception to Peterloon in 1980 to allow the house and grounds to be used for meetings and special events. It also concluded that no restrictions were placed on the authorization of the use.

**{¶17}** The Paquins[4] and others appealed the planning commission's decision to the city council pursuant to the Indian Hill Zoning Ordinance. In their notice of appeal to the city council, the Paquins admitted that the planning commission's 1980 approval allowing Peterloon to host outdoor events "contained no conditions to its effectiveness."

**{¶18}** After conducting additional public hearings, the city council passed the noise resolution on March 21, 2022. Like the planning commission, it determined that the approval given to Peterloon in 1980 allowed it to use its house and grounds for meetings and other occasions without additional restrictions on that use. But unlike

---

[4] We note that Dr. Joanna Paquin did not participate in the planning commission process, but did file an appeal to city council of the planning commission's decision. To have standing to challenge a land use decision by way of R.C. Ch. 2506, a neighboring property owner must actively participate in the administrative process. *Willoughby Hills v. C.C. Bar's Sahara*, 64 Ohio St.3d 24, 26 (1992). Because the Indian Hill Zoning Ordinance allows residents to appeal to the city council from a decision of the planning commission without regard to their participation in the planning commission process, we conclude that Dr. Joanna Paquin has sufficiently participated in the administrative process to have standing in this appeal.

the planning commission, the city council exercised its power under Section 101.482 of the zoning ordinance to impose additional conditions on Peterloon's use of its property. It accordingly adopted guidelines for amplified sound at Peterloon's events. These guidelines prohibit amplified music after 11:30 p.m., require speakers to be directed away from neighboring subdivisions, and impose decibel and live band limits. The guidelines also provide a comprehensive scheme of escalating remedies if Peterloon violates the noise regulations.

### C. The Tent Resolution

{¶20} On August 21, 2021, Peterloon sought a special exception from the planning commission to erect a semi-permanent tent on its property. Its application explained that the tent would be erected from March through July of 2022 to host nonprofit events, fundraisers, weddings, and similar social gatherings. To minimize disruption to the surrounding residents caused by individual tent installations, Peterloon desired to put up a tent that would last the entire event season. Peterloon also explained that it could better control sound at its events by using a semi-permanent tent.

{¶21} The planning commission conducted a public hearing on Peterloon's special exception application. It conditionally approved the application subject to the requirement that all DJs and live bands be located inside the tent and that Peterloon submit its acoustical site plan to Indian Hall staff for review. The conditional approval made clear that Peterloon was approved to erect a tent solely for the 2022 season and would therefore need to reapply should it intend to install a tent in 2023 or beyond.

{¶22} As they did with the noise resolution, the Paquins and others appealed the planning commission's approval to the city council. On March 21, 2022, the city

council passed the tent resolution, which adopted the planning commission's decision as written.

### D.     The R.C. Ch. 2506 Administrative Appeal

{¶23}  The Paquins appealed both the noise resolution and the tent resolution to the common pleas court in an R.C. Ch. 2506 administrative appeal.  They argued that the city council's decisions to adopt both enactments rested upon an improper interpretation of the 1980 approval.  More specifically, they contended that the planning commission's original decision to permit outdoor events at Peterloon did not allow commercial uses of the property, like wedding rentals.

{¶24}  Peterloon intervened in the Paquins' administrative appeal.  It argued that its wedding operations were in accordance with the planning commission's 1980 approval and that the city council's resolutions were supported by evidence presented through the public hearing process.

{¶25}  On February 14, 2024, the magistrate issued a decision siding with the Paquins.  In doing so, the magistrate observed that the frequency of outdoor weddings at Peterloon had intensified beginning in 2021, resulting in $155,000 in revenue from 20 outdoor events that year.  According to the magistrate, these events could only lawfully occur if they fell within the scope of the planning commission's 1980 approval.  The city council interpreted that approval to place no conditions on events held by outside groups at the estate.  But the magistrate read the 1980 approval differently.

{¶26}  First, in construing the extent of the planning commission's approval, the magistrate interpreted Peterloon's description of its proposed activities to limit its operations.  The minutes of the 1980 planning commission meeting reflect that Peterloon sought to use it grounds "for meetings and other occasions sponsored by

groups other than the Junior League." Without explaining why, the magistrate held that weddings are not "sponsored by groups" and therefore fall outside the range of activities contemplated by the 1980 approval.

**{¶27}** Next, the magistrate construed the language in then-existing Paragraph 61.155, which authorized "[p]rivate golf courses, lodges, clubs, country clubs, riding clubs, polo clubs, tennis courts and the like, all of a non-commercial nature." Without specifically defining the term "non-commercial," she rejected arguments by Peterloon and Indian Hill that the nonprofit nature of the Peterloon Foundation rendered its activities "non-commercial." Instead, the magistrate implied that, because Peterloon received revenue for weddings and outdoor events, those activities were commercial in nature and therefore unauthorized by Paragraph 61.155.

**{¶28}** The magistrate accordingly concluded that the city council acted unreasonably and arbitrarily in enacting the noise and tent resolutions. She also concluded that the noise resolution was illegal, while not reaching that same conclusion as to the tent resolution. She therefore concluded that the city council's resolutions were in error and remanded the matter to the city council to consider the Paquins' administrative appeal in light of the correct construction of the 1980 approval. Given this outcome, the magistrate declined to rule on additional arguments raised by the Paquins in the administrative appeal, finding them to be moot.[5]

**{¶29}** Peterloon objected to the magistrate's decision. On January 26, 2024, the trial court overruled the objections and adopted the decision of the magistrate as written. It entered final judgment in the Paquins' favor on March 7, 2024, specifically

---

[5] For example, the Paquins argued below that the tent resolution failed to satisfy the special exception standards in Section 101.431 of the Indian Hill zoning ordinance. The magistrate did not address this argument in her decision.

holding that "Peterloon's 2021 uses were not 'sponsored by groups' and were commercial in nature." The trial court subsequently stayed its order pending appeal.

{¶30} Peterloon now appeals under R.C. Ch. 2506.

## II.    *Justiciability*

### A.    *R.C. Ch. 2506 Jurisdiction*

{¶31} As a starting point, neither the Paquins nor Peterloon raised the question of our subject-matter jurisdiction in their briefs. But where jurisdiction appears uncertain, a court of appeals is obligated to consider the issue on its own accord. *See State v. Burge*, 2017-Ohio-5846, ¶ 50 (9th Dist.). We therefore asked the parties to discuss in supplemental briefing whether the noise resolution is the proper subject of an R.C. Ch. 2506 appeal. More specifically, we asked the parties to address whether the city council acted in its legislative or administrative capacity when it adopted the noise resolution.

{¶32} Entitled "Appeals from Orders of Administrative Officers and Agencies," R.C. Ch. 2506 makes the final orders, adjudications, and decisions of a broad range of governmental actors reviewable by the common pleas courts. *See* R.C. 2506.01 (describing scope of administrative decisions subject to R.C. Ch. 2506 judicial review). As judicially construed, R.C. Ch. 2506 confers jurisdiction on the courts of common pleas to review administrative, rather than legislative, action. *Engelhart v. Hamilton Cty. Bd. of Commrs.*, 2016-Ohio-4935, ¶ 8 (1st Dist.), citing *Osburn Towing v. Akron*, 2013-Ohio-5409, ¶ 9 (9th Dist.). Acts that are the result of a legislative body undertaking its legislative authority are not subject to administrative appeal. *Nyland v. Olmstead Falls City Council*, 2019-Ohio-4257, ¶ 12 (8th Dist.). Rather, only administrative actions that result from "quasi-judicial proceedings" are reviewable

11

under R.C. Ch. 2506. *See M.J. Kelley Co. v. City of Cleveland*, 32 Ohio St.2d 150 (1972), paragraph one of the syllabus. Thus, in assessing whether a court has jurisdiction under R.C. Ch. 2506, the critical question is whether the challenged governmental action is of an administrative or a legislative character.

**{¶33}** The nature of the body undertaking the challenged act is not necessarily dispositive of this question. While a city council's primary function may be to enact legislation, it may at times act in an administrative capacity, such as when it reviews the decisions of its own administrative agencies. *Engelhart*, 2016-Ohio-4935, at ¶ 8 (1st Dist.). As a result, other criteria outside the character of the body itself determine whether a particular act of government is fundamentally legislative or fundamentally administrative.

**{¶34}** One such criteria is the process by which the decision is made. The inquiry into whether a particular process is legislative or administrative focuses on what procedures the governmental body was required to follow, not what process it actually provided. *Harmon v. City of Cincinnati*, 2024-Ohio-2889, ¶ 27. In this regard, an administrative process is typically quasi-judicial, meaning that it includes notice, a hearing, and an opportunity to present evidence. *See Englehart* at ¶ 10. A quasi-judicial administrative action therefore resembles a court proceeding, in that an exercise of discretion is employed in adjudicating the rights and duties of parties with conflicting interests. *Holtkamp v. Joint Bd. of Cty. Commrs.*, 2011-Ohio-2986, ¶ 11 (5th Dist.). The facts that are considered in an administrative proceeding are similar to those tried to a jury and generally relate to a specific individual or applicant. *Id*. at ¶ 12.

**{¶35}** The legislative process, on the other hand, is more focused on developing policy or law in a generalized way. *Shaheen v. Cuyahoga Falls City Council*, 2010-Ohio-640, ¶ 23 (9th Dist.). It considers generalizations about a "state of affairs" in a manner oriented to developing new policies. *Id*.

**{¶36}** Another criteria that distinguishes legislative and administrative action is whether the decision implements or enforces pre-existing standards or creates entirely new ones. A legislative body performs a legislative act when it creates law, whereas an administrative act occurs when the legislative body executes or administers an existing law. *Nyland*, 2019-Ohio-4257, at ¶ 12 (8th Dist.), citing *Donnelly v. Fairview Park*, 13 Ohio St.2d 1, 4 (1968).

**{¶37}** The fact that a particular proceeding is focused on a single party is not necessarily dispositive of its character. For example, in *Nyland* at ¶ 2-5, 20, the Eighth District characterized a city council's resolution declaring a particular bridge to constitute a nuisance to be legislative rather than administrative. This was despite the fact that the city council conducted public hearings after providing notice to the affected property owners and focused its fact-finding on concerns from members of the public about the status of the bridge. *Id*. at ¶ 5-6. And in *Osburn Towing*, 2013-Ohio-5409, at ¶ 15-16 (9th Dist.), the court held that an amendment to an Akron ordinance changing the towing provider for a specific city district was legislative rather than administrative. This was because the focus of the government action in the case was not to "sanction or review" any "alleged violations or offenses" under standards already proscribed in the towing ordinance, as would typify an administrative proceeding. *Id*. at ¶ 16.

{¶38} Turning to the noise resolution before us, and applying the standards that differentiate legislative and administrative action, we see the fundamental character of the city council's action as legislative rather than administrative. This conclusion is driven by several key attributes of the city council's process in adopting the noise resolution, as well as the nature of the noise resolution itself.

{¶39} To begin, the process by which the city council adopted the noise resolution most closely resembles a legislative, rather than a quasi-judicial, proceeding. The city council came to consider the noise issue at Peterloon only after the planning commission had held a series of public hearings and reached a decision not to add any additional regulations to Peterloon's outdoor activities. Two different parties appealed the planning commission's decision to the city council pursuant to Section 101.3 of the Indian Hill Zoning Ordinance. One notice of appeal was submitted by a consortium of neighbors who live in the area surrounding Peterloon. Another was submitted by the Paquins. Both challenged the planning commission's decision not to regulate noise at Peterloon's outdoor events.

{¶40} To determine whether the city council's review of the planning commission's decision was quasi-judicial, we look not to the process that actually took place, but instead to what the city council's policies required. *See Harmon*, 2024-Ohio-2889, at ¶ 27. The requirements for a city council appeal from the decision of the planning commission are found in Section 101.3 of the Indian Hill Zoning Ordinance. That section permits "any property owner . . . affected by any ruling" of the planning commission to institute an appeal merely by filing a notice of appeal with the planning commission and the city council. Notice to the affected property owner is not required. Neither does Section 101.3 explicitly permit the presentation of

14

evidence by any party. While the city council must hold a hearing on the appeal within 60 days and must permit any party to the appeal to appear either in person or through an attorney, the rule does not specifically address the presentation of evidence. The Indian Hill Zoning Ordinance therefore fails to proscribe a quasi-judicial proceeding at the city council level, given that it does not require notice and the opportunity to present evidence. *See Engelhart*, 2016-Ohio-4935, at ¶ 10 (1st Dist.).[6]

{¶41} Even were we to reach further back into the governmental process and consider the planning commission activity as part of the city council's action—and we question the appropriateness of doing so since it is ultimately the city council's resolution we are reviewing—we would not find governmental activity that looks administrative. Before the planning commission voted not to regulate noise coming from Peterloon's outdoor events, it conducted eight public hearings on the topic. Agendas and minutes from these hearings indicate that they were called to "discuss concerns about *the lack of controls and limitations* on sound, music amplification, and the number of events for non-mission related activities" at Peterloon, not to apply any existing noise standard to Peterloon's operations. This is a critical difference in terms of the process that Indian Hill was required to follow.

{¶42} Section 101.451 of the Indian Hill Zoning Ordinance requires both general public notice and specific targeted notice to adjacent property owners when a landowner seeks a new special exception or when the city considers the expansion of

---

[6] While we are less concerned with what actually occurred under the relevant test for administrative action, and more concerned with what the applicable policies required, the record contains no indication that Peterloon actually received notice of the city council's hearings. *See Harmon* at ¶ 27. And the parties' counsel at oral argument could not point to any evidence that Peterloon received particularized notice of the proceedings. The absence of actual notice supports our conclusion that the city council acted legislatively, rather than administratively, in adopting the noise resolution.

an existing special exception. Section 101.452 then allows for the presentation of witnesses and evidence at a hearing convened by the planning commission in those circumstances. Decisions by the planning commission to reconsider or revoke a special exception are also governed by the same targeted notice and hearing requirements under Sections 101.482 and 101.484. But Indian Hill has no policies that govern notice and planning commission hearings about general community concerns. Nor does it regulate the conduct of planning commission business about the "lack of controls and limitations."

**{¶43}** As a result, no requirements governed the notice that would be given to Peterloon of the planning commission's hearings about its operations or ensured that Peterloon would be entitled to present evidence at these hearings. In the absence of policies mandating a quasi-judicial hearing, we see no administrative action at the planning commission stage of the proceedings.

**{¶44}** Buttressing our conclusion that the actions taken by Indian Hill to adopt the noise resolution were fundamentally legislative is the character of the resolution itself. Prior to the enactment of the resolution, no standards governed the level of noise generated from Peterloon's outdoor events. The description of the planning commission's hearings in its agendas confirmed as much, indicating that the hearings were to discuss "the *lack* of" noise-control regulations, not how to apply pre-existing ones. Instead, the city council created new standards in the noise resolution that never before applied to Peterloon—or anywhere else in the city for that matter.

**{¶45}** The adoption of new regulations is a legislative act. *Engelhart*, 2016-Ohio-4935, at ¶ 12 (1st Dist.). By enacting the noise resolution, the city council implemented new standards for noise generated by Peterloon's outdoor events. These

16

standards govern the placement of amplification devices on Peterloon's property, limit decibel levels based on the type of event, and regulate the conduct of live musicians. Importantly, the noise resolution also imposes escalating penalties should Peterloon violate the newly-created noise standards. All of this speaks to an exercise of legislative, rather than administrative, power.

{¶46} The city council therefore created a new law when it passed the noise ordinance. It did not administer a noise law already in existence. *See id*. This, combined with the lack of quasi-judicial hearing requirements, defines the character of the city council's action as fundamentally legislative in nature.

{¶47} Legislative acts are not reviewable in R.C. Ch. 2506 appeals. *M.J. Kelley Co.*, 32 Ohio St.2d 150, paragraph one of the syllabus. Thus, the trial court lacked subject-matter jurisdiction to review the noise resolution, and we accordingly vacate the trial court's judgment in that regard, as it is void. *See Pratts v. Hurley*, 2004-Ohio-1980, ¶ 11 (holding that actions taken by a court that lacks jurisdiction are void).

### B. Mootness

{¶48} We next consider our ability to resolve the parties' dispute as to the tent resolution. That enactment permitted Peterloon to erect a semi-permanent tent through November 2022, a time period which has long since passed. It is therefore possible that any legal issue with regard to the tent resolution is moot.

{¶49} Mootness is a jurisdictional question that must be addressed even if the parties do not raise it. *J.R.C.D.L. v. T.D.L.R.*, 2024-Ohio-1659, ¶ 10 (5th Dist.). A case is moot where a judgment is sought on a matter that when rendered does not have any practical effect upon the issues raised by the pleadings. *Id*. at ¶ 11. In other words, a

17

case becomes moot when it no longer presents a "live controvers[y]." *M.R. v. Niesen*, 2022-Ohio-1130, ¶ 10. Courts may hear a moot question, however, when it is capable of repetition but evades review. *Id.* at ¶ 11. This occurs when (1) the challenged action is too short in duration to be fully litigated prior to its expiration, and (2) there is a reasonable expectation that the same complaining party will be subjected to the same action again. *Id.*

{¶50} Viewed literally, the tent resolution presents a moot legal question. The enactment permitted Peterloon to erect a semi-permanent tent through November 2022, when it was required to take the tent down. It did not allow or govern any action beyond that date. Thus, the parties have no live controversy regarding the terms of the tent resolution, as its provisions have expired.

{¶51} But the questions presented by the tent resolution are capable of repetition and evading our review. It would be extremely rare for an R.C. Ch. 2506 appeal to be fully completed in the eight-month period during which the tent resolution allowed Peterloon to erect a tent. *See id.* at ¶ 11. And the issue is likely to repeat itself, given that Peterloon apparently sought a similar resolution for the spring and summer of 2023. Peterloon's circumstances therefore establish the mootness exception, and we accordingly have jurisdiction to review the tent resolution in this appeal.

### *Assignment of Error*

{¶52} Having resolved threshold questions of jurisdiction, we turn now to Peterloon's arguments. In a sole assignment of error, Peterloon contends that the trial court erred in reversing the noise and tent resolutions and in remanding the matters to the Indian Hill City Council. It presents three issues for our review. First, it argues

that the trial court deprived it of its constitutionally-protected, vested property rights. Second, it contends that the trial court exceeded its scope of review by reaching the question of whether Peterloon could host outdoor weddings at its property. Third, it claims that the trial court improperly substituted its own judgment for the city council's and disregarded the plain language of the 1980 approval.

{¶53} Because the third issue is dispositive of the remaining issues in this appeal, we consider it first. And we consider the trial court's interpretation of the 1980 approval solely in the context of the tent resolution, because we lack jurisdiction over the noise resolution.

{¶54} At the common pleas court stage, an R.C. Ch. 2506 appeal is reviewed under a de novo-like standard of review. *Shelly Materials, Inc. v. City of Streetsboro Planning & Zoning Comm.*, 2019-Ohio-4499, ¶ 13. The task of the common pleas court is to determine whether the administrative action was "unconstitutional, illegal, arbitrary, capricious, unreasonable, or unsupported by the preponderance of substantial, reliable, and probative evidence on the whole record." R.C. 2506.04. The grounds are disjunctive, such that each category in the list has a distinct meaning and offers a separate basis for reversal. *Shelly Materials* at ¶ 13.

{¶55} At the court of appeals stage, review in an R.C. Ch. 2506 appeal is limited to questions of law, which the court of appeals reviews de novo. *Id.* at ¶ 17; *Lind Media Co. v. Marion Twp. Bd. of Zoning Appeals*, 2022-Ohio-1361, ¶ 18 (3d Dist.); R.C. 2506.04. Where those questions concern the proper construction of a zoning code provision, courts largely apply ordinary principles of statutory interpretation. *Brunswick Ltd. Partnership v. City of Brunswick*, 2024-Ohio-3351, ¶ 27 (9th Dist.). Two distinct principles, however, guide that endeavor. First, zoning

ordinances that restrict land use are strictly construed in favor of the landowner, because they are in derogation of common law property rights. *Terry v. Spivey*, 2011-Ohio-3364, ¶ 19. Second, exceptions from restrictive zoning ordinances are liberally construed, for the same reason. *Id.*

{¶56} Peterloon asks us to review the trial court's interpretation of the 1980 approval—and more specifically what is meant by the phrases "sponsored by groups" and "non-commercial in nature" in the context of its outdoor wedding operations. Because this issue involves the meaning of a zoning restriction, we review the question de novo. *Lind Media* at ¶ 23.

{¶57} In interpreting a zoning provision, we give words their ordinary and plain meaning, to the extent we can ascertain what that is. *Willow Grove, Ltd. v. Olmsted Twp. Bd. of Zoning Appeals*, 2022-Ohio-4364, ¶ 18. Where a zoning provision is ambiguous, principles of statutory construction can help pin down what the governing body meant when it adopted a particular provision. *Lind Media* at ¶ 27. Those principles include interpreting the enactment as a whole, such that no words or phrases are left without meaning, and assuming that the legislative body did not intend absurd results in crafting the regulation. *See State v. Wilson*, 2020-Ohio-1584, ¶ 13-14 (1st Dist.). We may also consider, but are not required to defer to, an administrative agency's interpretation in construing an administrative regulation. *TWISM Ents., LLC v. State Bd. of Registration for Professional Engineers & Surveyors*, 2022-Ohio-4677, ¶ 28, 47.

{¶58} We begin with the phrase "sponsored by groups." The plain meaning of this term is knowable and understandable. A "sponsor" is "a person or an organization that pays for or plans and carries out a project or activity." *Merriam-Webster Online*,

https://www.merriam-webster.com/dictionary/sponsor (accessed Nov. 27, 2024). To "sponsor" an event is "to be or stand sponsor for" it. *Id.* A "group" is "two or more figures forming a complete unit in a composition" or "a number of individuals assembled together or having some unifying relationship." *Id.* at https://www.merriam-webster.com/dictionary/group (accessed Nov. 27, 2024). To be "sponsored by groups" is therefore to be paid for or planned by two or more individuals who come together for a unifying reason.

{¶59} Weddings squarely fall within this definition. At the very least, a wedding necessarily involves two parties coming together in marriage, a number and purpose sufficient to satisfy the standard dictionary meaning of the phrase "sponsored by groups." *See id.* at https://www.merriam-webster.com/dictionary/wedding (accessed Nov. 27, 2024) (defining "wedding" as "a marriage ceremony"); R.C. 3101.01(A) (defining "marriage" as involving two parties). But, as the record reveals in this case, weddings are often much more elaborate affairs, involving large numbers of guests who gather in support of the couple. Given that weddings of all varieties, from the simple to the lavish, contain an essential common purpose—to support the couple's marriage—and at least two willing participants—the two individuals getting married—we have no trouble concluding that weddings are in fact "sponsored by groups."

{¶60} Our interpretation of the term "non-commercial" is a bit more complicated. The minutes from the planning commission's January 1980 meeting ground Peterloon's approval for outdoor events in Paragraph 61.155 of the then-existing zoning ordinance. That provision permits certain uses of a private recreational nature, like golf courses and country clubs, provided that they are "non-

21

commercial in nature." When read as a whole, the meaning of this provision is admittedly confusing. How can a facility that a patron pays to access, like a private golf course or polo club, operate in a non-commercial manner?

{¶61} Peterloon answers the question by arguing that "non-commercial" essentially means "nonprofit." From Peterloon's perspective, private recreational facilities can accept payment from customers provided that they do not generate profits for the company's owner. This reading has appeal, as the word "commercial" typically means "viewed with regard to profit," and "non-commercial" would therefore mean "nonprofit." *Merriam-Webster Online*, https://www.merriam-webster.com/dictionary/commercial (accessed Nov. 27, 2024). But the Paquins argue that the limitation to "non-commercial" uses means that an activity conducted by a use on Paragraph 61.155's list cannot generate revenue at all. Standing alone, this interpretation is also reasonable, in that draws from the definition of "commerce" as "the exchange or buying and selling of commodities." *Id.* at https://www.merriam-webster.com/dictionary/commerce (accessed Nov. 27, 2024). The meaning of the phrase "non-commercial in nature" in Paragraph 61.155 is therefore ambiguous, because the parties advance conflicting, but reasonable, constructions. *See Family Medicine Found., Inc. v. Bright*, 2002-Ohio-4034, ¶ 8 ("a statute is ambiguous when its language is subject to more than one reasonable interpretation").

{¶62} Faced with these competing, plausible interpretations, we rely on principles of statutory construction to resolve the debate. As a starting point, we are guided by the instruction to liberally construe provisions that expand land use and to strictly construe those that constrict it. *Terry*, 2011-Ohio-3364, at ¶ 19; *Cleveland Clinic Found. v. Bd. of Zoning Appeals*, 2014-Ohio-4809, ¶ 34 ("[R]estrictions

22

imposed on the use of private property . . . must be strictly construed, and the scope of the restrictions cannot be extended to include limitations not clearly prescribed. . . . In other words, we do not permit zoning limitations by implication." (Citations omitted)).

{¶63} This principle suggests that Peterloon's reading of Paragraph 61.155 should control. If we interpret Paragraph 61.155 to permit nonprofit recreational clubs, we expand the range of available land uses in Indian Hill. Private golf courses, country clubs, and sporting clubs can receive revenue for business activities so long as the operation itself is not a for-profit endeavor. This facilities broad use of land. But if we interpret Paragraph 61.155 to permit only those private golf courses, country clubs, and polo clubs that do not accept revenue, we shrink what a landowner can do with its property. Under this interpretation, only those clubs that are willing to make their facilities open without charge can operate in Indian Hill. This restricts the use of land. Our precedent encourages the former result. *See Cleveland Clinic* at ¶ 34.

{¶64} Further counseling in favor of Peterloon's nonprofit theory is that treating the "non-commercial" limitation as a ban on revenue leads to absurd results. Construing a similar list of land uses in 1963, this court observed that there is no precise definition of what constitutes a "country club" or a "golf course." *Amberley Swim & Country Club, Inc. v. Zoning Bd. of Appeals of Amberley Village*, 117 Ohio App. 466, 469-469 (1st Dist. 1963). But at the very least, we noted, country clubs exist to include a golf course, and golf courses are comprised of significant open acreage over which a person can hit a small ball long distances without obstruction from others. *Id.* Private golf courses and country clubs therefore involve significant operational expenditures, and they therefore typically charge members for access and usage to offset these costs. *See, e.g., Caley v. Glenmoor Country Club, Inc.*, 2013-

23

Ohio-4877, ¶ 3-5 (5th Dist.) (describing membership agreement at country club).  But interpreting the phrase "non-commercial in nature" to restrict private clubs from receiving payment for their services essentially requires these businesses to operate free of charge.  Nothing in the record endorses, much less commands, this absurd outcome.

{¶65}  Statutory construction principles also require us to read Paragraph 61.155 as a whole, rather than separating out a single phrase and attempting to define it out of context.  *See Vorhees v. Anderson Twp. Bd. of Zoning Appeals*, 2024-Ohio-4459, ¶ 41.  Looking at the structure of Paragraph 61.155, it is clear that the phrase "non-commercial" modifies the list of land uses that precedes it:  private golf courses, country clubs, and the like.  The phrase "non-commercial" therefore pertains to the use of land itself, rather than individual activities that might take place once a use is established.  Reading the term in context therefore demonstrates that it is a limitation on the manner in which a land use is established, rather than a prohibition on generating revenue through that use.

{¶66}  General principles of statutory construction thus lead us to the conclusion that "non-commercial" means "nonprofit" in the context of Paragrah 61.155.  But if we needed additional support for this idea, case law also suggests that Paragraph 61.155 permits wedding rentals.  As the Fifth District observed in *Welling v. Perry Twp. Bd. of Zoning Appeals*, 2002-Ohio-6550, ¶ 12 (5th Dist.), weddings are a customary accessory use of country clubs and private golf courses.  But weddings would be barred if we interpreted Paragraph 61.155 to prohibit the uses enumerated in that provision from collecting revenue for facilities rentals and other events.  We decline to reach this result.

{¶67} And finally we credit Indian Hill's interpretation of its own historical records and zoning provisions, particularly in light of the truncated record explaining their significance. While we are not required to defer to the city council's interpretation that weddings are permitted under the 1980 approval, we acknowledge the alignment of Indian Hill's interpretation with the one we reach independently. *See TWISM*, 2022-Ohio-4677, at ¶ 28, 47. After all, Indian Hill has greater insight into what it meant when it enacted Paragraph 61.155 and when it approved Peterloon's uses in 1980 than we do.

{¶68} Paragraph 61.155 was included in a zoning ordinance adopted in May 1975, nearly half a century ago. The record does not reveal whether any private clubs were in operation at the time in Indian Hill or whether they regularly rented their facilities for events. But the record does demonstrate that Indian Hill has consistently interpreted Paragraph 61.155 to allow wedding rentals at Peterloon. Those events date as far back as 1983, have been conducted openly, and have never been directly prohibited or impeded by Indian Hill. The history of weddings at Peterloon coupled with Indian Hill's lack of legislative or administrative action to change Peterloon's use of its property suggests that weddings are permitted by Paragraph 61.155.

{¶69} Moreover, in December of 1980, the planning commission granted Peterloon permission to provide alcohol at rental events, and in 1990, the planning commission permitted Peterloon to sell memberships to its gardens as a "place of assembly." These actions suggest that Indian Hill viewed facilities rentals and the receipt of income from memberships as being consistent with Paragraph 61.155's limitation on "non-commercial" uses. From these separate approvals, we glean that

Indian Hill has interpreted the 1980 approval to permit weddings, even those that generate income for Peterloon.

{¶70} Thus, we conclude, as a matter of law, that the trial court erred in finding the tent resolution to be arbitrary and unreasonable. The trial court faulted the city council for concluding that the 1980 approval was issued without limitation. And it held that the terms "sponsored by groups" and "non-commercial in nature" both prohibit weddings at Peterloon. But the plain meaning of the phrase "sponsored by groups," and the meaning of the phrase "non-commercial in nature" that we discern through statutory construction, permit rather than prohibit Peterloon's outdoor event operations. As a result, the city council committed no error in construing the 1980 approval to impose no additional conditions on events at Peterloon, and the trial court erroneously construed the applicable zoning regulations to prohibit those events.

{¶71} We accordingly sustain Peterloon's assignment of error as to the tent resolution, reverse the decision of the trial court invalidating that action by the city council, and remand the cause to the trial court.

### Conclusion

{¶72} In this administrative appeal, we conclude that the trial court lacked jurisdiction to review legislative action taken by the Indian Hill City Council in adopting noise regulations for Peterloon's outdoor events. We accordingly vacate the trial court's judgment as to the noise resolution because it was not the proper subject of an R.C. Ch. 2506 appeal. We reverse on its merits the trial court's judgment as to the tent resolution. The trial court incorrectly interpreted the terms "sponsored by groups" and "non-commercial in nature," both of which permit Peterloon to use its property for outdoor events and weddings rentals. For these reasons, we sustain

Peterloon's assignment of error and remand the cause to the trial court to consider the Paquins' remaining arguments with regard to the tent resolution.

Judgment vacated in part, reversed in part, and cause remanded.

**BERGERON, J.,** concurs.
**ZAYAS, P.J.,** dissents.

**ZAYAS, P.J.,** dissenting.

{¶73} I dissent from the majority's opinion for the reasons more fully explained below. The majority reaches its decision by gutting provisions of the Village of Indian Hill Zoning Ordinance ("the Zoning Ordinance") and redefining the word "group" to depart not only from its original meaning, but also from its meaning within the context of the special exception use in this case.

{¶74} Under the majority's version of the facts, the Council of the City of the Village of Indian Hill, Ohio, ("council") imposed a noise ordinance that was solely applicable to one residence. In actuality, the Village of Indian Hill Planning Commission ("the commission") exercised its express authority of continuing jurisdiction under the Zoning Ordinance to consider whether to impose additional conditions on the previously authorized special exception use in order to minimize the adverse impacts of the exception on the surrounding community, and council then exercised its appellate authority under the Zoning Ordinance to review the decision of the commission. Because I would resolve the jurisdictional question looking to the full picture of what actually occurred, I dissent from the majority's opinion for the reasons more fully explained below. I would hold that council's decision was reviewable under R.C. Ch. 2506 as the decision was administrative in nature and the ultimate product of quasi-judicial proceedings.

27

{¶75} Additionally, in applying the plain meaning of the language of the relevant Zoning Ordinance, I would hold that the trial court correctly interpreted the 1980 authorization as limiting the estate's use of the house and grounds "for meetings and other occasions sponsored by groups other than the Junior League, of a non-commercial nature." I do so by reviewing the language of the 1980 authorization within the full context of the information available, rather than viewing certain words in isolation to reach an illogical result.

{¶76} For these reasons, I would affirm the judgment of the trial court, reversing and vacating council's resolutions and remanding the matter to council to consider the cause when applying the proper interpretation of the 1980 authorization.

## I. *Introduction*

{¶77} In this administrative zoning appeal, the predominant question at issue is the ability of a historical estate, located in a residential district, to open its grounds to the general public as a wedding venue.

{¶78} To start, it is undisputed in this case that use of the private grounds as a public venue for weddings and other occasions is not an expressly permitted use in the district in which the estate is located. So, use of the grounds of this residence as a public venue for weddings must be specifically authorized in order for such a use to be permitted. The underlying claim, from the start, has been that the estate was granted a special exception in 1980 that authorized use of the private grounds as a public venue for weddings and other occasions. Keeping this in mind, I proceed to address the issues presented by this appeal.

## II.    Background Information
### A.  The 1980 Authorization

**{¶79}**  From the limited record provided of the meeting before the commission in 1980, it appears that a representative of the estate appeared before the commission at the meeting to discuss authorization for certain specified uses.  The meeting minutes state:

> Mr. Chatfield appeared before the commission on behalf of the Trustees of the Peterloon Foundation.  Peterloon is the estate of the late John J. Emery at 8605 Hopewell Road.  The president of the Trustees, Mrs. John Steele, had written a letter to the Planning Commission dated November 9, 1979, in which she requested that the commission determine whether or not the zoning ordinance would permit the leasing of a part of the guest wing of the Peterloon Mansion to the Junior League for use as their headquarters.  It was also proposed that other areas of the house and grounds might be used for meetings and other occasions *sponsored by groups other than the Junior League*.  It was the consensus of the commission that these activities would be permitted under Paragraph 61.155 of the Zoning Ordinance; therefore, the commission gave its specific authorization for the uses requested.

(Emphasis added.)

**{¶80}**  This is the entirety of the information included in the record about the 1980 authorization.  The only other information included in the record relevant to the 1980 authorization is an excerpt of the Zoning Ordinance, a single page, as it then existed (page 7 of the 1975 Zoning Ordinance).  The page reflects the language of the referenced Paragraph 61.155, which says, "Private golf courses, lodges, clubs, country

29

clubs, riding clubs, polo clubs, tennis courts and the like, all of a non-commercial nature."

{¶81} This single page from the 1975 ordinance does not reflect the full context in which Paragraph 61.155 was located within the ordinance. However, a comparison of the then-existing Zoning Ordinance to the current Zoning Ordinance permits a reasonable inference that Paragraph 61.155 was included amongst the list of uses that required specific authorization from the commission, and, under Paragraph 61.16 of the 1975 Zoning Ordinance (also shown on the single page included in the record), such specifically authorized uses were "subject to the continuing jurisdiction of the Commission. . . and no changes in the use as authorized by the Commission [were to] be made without permission of the Commission."

### B. Other Historical Authorizations

{¶82} Later that same year, 1980, a representative of the estate again appeared before the commission, this time to request a variance. The meeting minutes state:

> Mr. Chatfield explained to the Commission that the John Emery mansion at 8605 Hopewell Road was being rented out by the Peterloon Foundation for social occasions. In order for liquor to be served at these functions, *the sponsoring organization* had to get a variance from the planning commission and one day permit from the State Liquor Control Board. Such application to the state had to be in the hands of the Board 45 days before the date needed. He proposed that the variance be granted to the Peterloon Foundation, which would then apply for a permanent liquor license. He assured the Commission that the liquor would served *only by the sponsoring organizations*, and that the

Peterloon Foundation would not go into the commercial liquor sales business. By unanimous voice vote, the Commission approved the requested variance.

(Emphasis added.)

**{¶83}** Further, in 1990, the estate appeared before the commission to request a special exception "to allow a place of assembly use" "for the purpose of allowing members to gather and view the gardens on a non-commercial basis." The commission granted the request "on the condition that a cap of two hundred (200) memberships be placed on the foundation and that this will be reviewed annually, or upon request of the applicant." In the commission's findings of fact and conclusions of law, it said that the request was "to allow the sale of memberships, on a non-commercial basis, to 'Peterloon Walks in the Garden.'" It further said that the purpose of the memberships was "to provide for the maintenance of the gardens," and that granting the request was "consistent with the character of the immediate vicinity, as the property is currently used for public functions and activities and is located in District 'A' (5 Acre)." Even further, it said that the "[a]nticipated activity levels will be similar to the current activity levels associated with dinners and activities at the Peterloon residence."

**{¶84}** So, at this juncture, the estate had requested and received the following approvals from the commission: (1) lease a part of the guest wing of the house to the Junior League for use as its headquarters, (2) use other areas of the house and grounds for meetings and other occasions sponsored by groups other than the Junior League, (3) obtain a permanent liquor license that would allow sponsoring organizations renting the "mansion" for social occasions to serve alcohol, and (4) sell limited

31

memberships to allow members of the public to gather and view the gardens on a non-commercial basis.

## C. The Current Use Dispute

{¶85} In November 2020, John Von Lehman, a nearby resident who had previously made noise complaints about the estate, sent a request to the assistant city manager—Jon West—for the "document" that authorized the estate to host events. More specifically, he requested "the authorization for outdoor music and any limitations on how loud the music can be and the reference, if any, to the rights of nearby residents." In response, West sent Von Lehman the 1980 authorization. In doing so, he informed Von Lehman that the planning commission had approved the estate's request to host "meetings and other charitable events" "with no preset conditions or restrictions."

{¶86} So, in December 2020, Von Lehman submitted a request to the commission to appear before it at the upcoming meeting to request an addendum to the 1980 authorization, "adding controls and limitations on sound or music amplification and limitations on the number of events for non-mission related activities at the Peterloon Foundation Property." The request contained five proposed conditions to be added to the 1980 approval related to limiting the amplification and sound and the number of events at the estate.

{¶87} Ultimately, Von Lehman's request came before the commission at public hearings on January 19, February 16, March 16, April 20, May 18, June 15, August 3, and August 17, 2021. During the course of these proceedings, the commission heard arguments and took evidence from the estate, Von Lehman, and others, including Jason Paquin. Eventually, a motion was made to approve certain

operating guidelines for the estate, but the motion was denied by a two to one roll call vote, so the matter was adjourned.

**{¶88}** In the commission's written findings of fact and conclusions of law, the commission determined that, because the motion to impose guidelines on the estate failed, it was "not necessary to adopt any restrictions" at the time. However, the commission reserved the right to impose such restrictions or other conditions in the future. Of note, the commission found that the estate operates as "an approved special exception to the district regulations for the house and grounds to be used for meetings and other occasions, authorized by the Planning Commission at a public hearing on January 22, 1980," and that "no Restrictions were placed on the authorization of the use." However, the commission also found that uses authorized as special exceptions "are subject to the continuing jurisdiction of the Commission," and thus found that the commission "may add additional conditions as are necessary to an approved special exception."

**{¶89}** Various neighboring residents, including the Paquins, appealed the commission's decision to council. The matter came before council at public hearings on December 15, 2021, and January 13, February 7, February 22, and March 21, 2022. During the course of these proceedings, council heard additional arguments and took additional evidence from the estate, Von Lehman, and others, including Jason Paquin. Ultimately, council unanimously voted to affirm the decision of the commission as modified with certain operating guidelines for the estate. Accordingly, in Resolution No. 05-22 ("the noise resolution"), council made the following findings of fact:

1. The City Council finds that [the estate] . . . operates as an approved special exception to the district regulations, allowing the house and

33

grounds for meetings and other occasions, authorized by the Planning Commission at the public hearing on January 22, 1980.

2. The City Council finds that no restrictions were placed on the authorization of the use at that time.

3. The City Council finds that uses authorized by the Planning Commission as special exceptions are subject to the continuing jurisdiction of the Planning Commission and all future applications for site clearance shall be approved by the Planning Commission before the issuance of a site clearance, and no changes in the use as authorized by the Planning Commission shall be made without permission of the Planning Commission, per section 101.481 of the Zoning Ordinance.

4. The City Council finds that the Planning Commission may add additional conditions as are necessary to an approved special exception, in order to carry out the purposes of the Zoning Ordinance and to prevent or minimize adverse effects upon other property in the neighborhood, per section 101.482 of the Zoning Ordinance.

5. The City Council finds that the restrictions set forth in Exhibit A, titled "Amplified Music Operating Guidelines for Outdoor Events" are reasonable and are hereby adopted and incorporated as a condition of the . . . Special Exception.

. . .

6. The City Council finds that the Planning Commission has continuing jurisdiction over enforcement of the conditions to the . . . Special Exception set forth in Exhibit A.

{¶90} Based on these findings, council concluded that the incorporated restrictions on the estate's operation carried out the purposes of the Zoning Ordinance and "prevent[ed] or minimize[d] adverse effects upon other properties in the neighborhood resulting from" the special exception.

{¶91} The Paquins ultimately appealed this decision to the court of common pleas under R.C. Ch. 2506. The Paquins also appealed from council's separate resolution authorizing a special exception for a "seasonal event structure" (a large tent) to be erected on the estate's grounds from March to November for the purpose of hosting events at the estate.

### III. R.C. Ch. 2506 Reviewability

{¶92} The majority suggests that the trial court lacked subject-matter jurisdiction to review council's noise resolution because, in imposing the noise conditions, council acted in a legislative capacity, rather than an administrative capacity. For the reasons discussed below, I disagree.

### A. Pertinent Legal History

{¶93} Ohio Const., art. IV, § 4(B) provides the court of common pleas with "such powers of review of proceedings of administrative officers and agencies as may be provided by law." "Proceedings" within this context has been consistently construed by the Ohio Supreme Court to contemplate quasi-judicial proceedings only. *See M.J. Kelley Co. v. Cleveland*, 32 Ohio St.2d 150, 152-153 (1972), citing *Fortner v. Thomas*, 22 Ohio St.2d 13, 14 (1970). Consequently, the Ohio Supreme Court has said that "it follows that in order for an administrative act to be appealable under R.C. 2506.01[,] such act must be the product of a quasi-judicial proceeding." *Id.* at 153.

{¶94} In determining whether an act is the product of a quasi-judicial proceeding, courts look to whether the function in question involves the exercise of discretion and requires notice, a hearing, and an opportunity to present evidence. *Id.* In other words, the term "quasi-judicial" signifies that the public body in question acted similarly to a court in that witnesses were examined, a hearing was had, and findings or decisions were made, all in accordance with statutory authority. *Id.*, citing *Zangerle v. Evatt*, 139 Ohio St. 563 (1942) (Williams, J., concurring).

{¶95} "A public body essentially legislative in character may act in an administrative capacity." *Donnelly v. Fairview Park*, 13 Ohio St.2d 1, 3 (1968). As a comparison, "the adoption or amendment of a zoning regulation or ordinance is a legislative act. . ., but the failure or refusal to approve a resubdivision of land coming within the terms of a zoning regulation or ordinance already adopted and in existence is an administrative matter." *Id.* at 3-4. So, when examining the reviewability of an act by a public body that is essentially legislative in character, courts must look to how that public body was functioning and ask whether the action taken by the public body was one making a law or executing or administering a law already in existence. *Id.* at 4; *see also generally Union Title Co. v. State Bd. of Edn.*, 51 Ohio St.3d 189, 191 (1990) (explaining that, in the context of determining whether an administrative agency is acting in a quasi-legislative manner, "courts have examined the nature of the proceedings themselves, to ascertain whether they involve the making or revising of rules, rather than the application of rules in an adjudicatory manner."). If the act in question creates law, it is legislative. *Id.*; *Union* at 191. On other hand, if the act administers or executes an existing law, it is administrative. *Id.*; *Union* at 191-192.

### B. Whether the Proceedings Were Quasi-Judicial Administrative Proceedings

**{¶96}** The issue that came before the commission in this case was whether certain additional conditions should be imposed on the use of the estate that was previously authorized as a special exception in 1980.

**{¶97}** Section 101.4 of the Zoning Ordinance governs special exceptions. Special exceptions are:

> uses which are generally compatible with the other land uses permitted in a given zoning district, but which, because of their potential adverse impact on the use and enjoyment of nearby properties, require individual review of their location, site design, and/or operation, and the imposition of such conditions as the Commission may deem necessary in order to minimize potential adverse impacts of the particular exception and to ensure that the exception is consistent with the character of the neighborhood.

Indian Hill Cod.Ord. 101.41.

**{¶98}** Under the Zoning Ordinance, the commission may impose "such conditions and restrictions upon the establishment, location, construction, maintenance and operation of the special exception as the Commission deems necessary to secure compliance with the standards set forth in [section 101.4] and to carry out the purposes of the ordinance." Indian Hill Cod.Ord. 101.432.

**{¶99}** Naturally, the Zoning Ordinance sets forth the procedure for a property owner, or any person having an interest in property, to apply for a special exception. *See* Indian Hill Cod.Ord. 101.44 – 101.46. As the majority acknowledges, resolution

of such an application requires notice and a hearing, with the opportunity to present evidence and argument. *See* Indian Hill Cod.Ord. 101.451-101.452.

{¶100} Further, the Zoning Ordinance sets forth the continuing jurisdiction of the planning commission over special exceptions and its authority to reconsider or revoke a special exception. *See* Indian Hill Cod.Ord. 101.48. Under its authority to reconsider a special exception, the commission may "add additional conditions as are necessary, in order to carry out the purposes of [the Zoning Ordinance] and to prevent or minimize adverse effects upon other property in the neighborhood." *See* Indian Hill Cod.Ord. 101.482. As the majority again acknowledges, the commission may not impose any additional conditions without first providing notice and a hearing in the same manner that it would upon an application for a new special exception. *See id.*

{¶101} Despite the above-mentioned acknowledgments, the majority suggests that no notice or hearing requirements were applicable to the proceedings before the commission as the Zoning Ordinance does not regulate the "lack of controls and limitations" on special exceptions. I disagree. The "lack of controls and limitations" on a special exception falls squarely within the commission's provided power under the Zoning Ordinance to reconsider a special exception and add whatever conditions it deems necessary to prevent or minimize adverse effects upon other property in the neighborhood. *See* Indian Hill Cod.Ord. 101.48. Consequently, the commission was in fact required to provide notice and a hearing in the same manner that it would upon an application for a new special exception prior to imposing any new conditions on the estate, and no one is contesting that it did.

{¶102} Further, the commission was determining whether to impose additional conditions on a use previously authorized as a special exception, a function within its

authority under the terms of the Zoning Ordinance that was already adopted and in existence. *See* Indian Hill Cod.Ord. 101.48. It did not create any new law. It was exercising its authorized discretion to consider whether any new conditions were needed to ensure that the previously-authorized special exception was operating within the parameters of the standards set forth in the Zoning Ordinance for special exceptions and in accordance with purpose of the Zoning Ordinance, as required of it in Section 101.482 of the Zoning Ordinance. *See generally Gross Builders v. City of Tallmadge*, 2005-Ohio-4268, ¶ 27 (9th Dist.).

{¶103} Under the authority granted to it under Indian Hill Cod.Ord. 101.48, the commission's very function was to determine whether any additional conditions were necessary to prevent or minimize the adverse effects of the special exception upon other property in the neighborhood, including ensuring that it will not injure, diminish, or impede the use, enjoyment, or character of the immediately surrounding area. *See* Indian Hill Cod.Ord. 101.43. The very dispute before the commission that invoked this review was a dispute between the estate and surrounding neighbors who felt that the special exception was having an adverse impact on properties immediately adjacent to the estate due to the disturbance of the noise generated by use of the estate for weddings and other occasions. The commission was very clearly resolving an actual controversy between parties legitimately affected by the specific facts of the case and determining the rights and/or duties of the estate. *See Englehart v. Hamilton Cty. Bd. of Commrs.*, 2016-Ohio-4935, ¶ 12 (1st Dist.), citing *Shaheen v. Cuyahoga Falls City Council*, 2010-Ohio-640, ¶ 22 (9th Dist.) ("The facts considered in a quasi-judicial administrative action relate to individuals or specific situations; they are 'roughly the types of facts that go to a jury in a jury case.'"); *Fortner*, 22 Ohio St.2d at

39

14 (indicating the requirements for a justiciable question); *Rossford Exempted Village School Dist. v. State Bd. of Edn.*, 45 Ohio St.3d 356, 359 (1989) ("Permitting appeal from a quasi-judicial proceeding is based on the premise that an adjudication has been made by the agency which determines the rights or duties of parties with conflicting interests—in other words, there is a justiciable dispute requiring evaluation and resolution. Implicit in this concept is the exercise of discretion.").

{¶104} For all these reasons, I would hold that the proceedings before the commission were administrative, and the commission's decision was the product of a quasi-judicial proceeding.

{¶105} The question now becomes whether the subsequent appeal to city council somehow changed the nature of the proceedings and rendered the order appealed from as legislative in nature, rather than administrative, as the majority suggests. I fail to see any authority that it did.

{¶106} Section 101.3 of the Zoning Ordinance governs appeals to council. The majority is correct that, although this provision does provide for a hearing on the appeal, it does not expressly require notice or an opportunity to present evidence. However, the majority fails to disclose that appeals to council are expressly determined based upon the record of the proceedings in front of the commission. *See* Indian Hill Cod.Ord. 101.3. In this case, there were eight public hearings held before the commission, which were all part of the record of proceedings for review by council.[7]

{¶107} It can only be reasoned that council's function of considering an appeal that is expressly based upon the record of the underlying quasi-judicial proceedings

---

[7] Council also took new evidence, and no one has challenged its authority to do so.

still falls within the realm of an administrative task and any act taken within that capacity is still the ultimate product of quasi-judicial proceedings. I have found no authority to the contrary nor is any cited by the majority. Such proceedings still resemble judicial proceedings and any decision that results from the appeal was decided based upon the discretion of the public body after review of the evidence that was presented, and required, in the underlying quasi-judicial proceedings. *See, e.g., Ivkovich v. City of Steubenville*, 144 Ohio App.3d 25, 33 (7th Dist. 2001) (holding that city council's decision on a conditional-use permit was appealable under R.C. Ch. 2506 where, although the zoning code did not require notice and a hearing for council's ultimate approval of the conditional use, notice and a hearing were required for the proceedings before the planning commission and council ultimately utilized its discretionary powers based upon a transcript of the proceedings before the commission and any new evidence); *Gross Builders*, 2005-Ohio-4268, ¶ 33 (9th Dist.) (holding that city council's decision on a conditional-use permit was the product of a quasi-judicial proceeding where it was the "final arbiter" of the issue and used its discretion based on information it received from a lower body that was required to provide notice and a hearing to the applicant and interested parties). It is illogical to suggest that, in determining whether the act in question was the product of a quasi-judicial proceeding, the underlying administrative proceedings must be detached from each other and considered separately, rather than reviewing the entirety of the administrative proceedings as a whole and giving due weight to the fact that council was ultimately acting in an appellate capacity, reviewing on appeal an administrative determination.

{¶108} Notably, this issue would only make it to council via an appeal under Section 101.3 of the Zoning Ordinance as it is the commission that is vested with original and continuing jurisdiction over special exceptions in the zoning ordinance.[8] Significantly, none of the cases relied upon by the majority govern a situation where the decision in question was the product of an appeal to a higher body that was considered only upon the record of the underlying quasi-judicial proceedings that occurred. Accordingly, those cases are not authority on the matter before us.

{¶109} Because council was acting in an administrative appellate capacity and utilizing its authorized discretion based upon the record of the underlying quasi-judicial proceedings and council's decision was therefore the ultimate product of quasi-judicial proceedings, the noise resolution was reviewable under R.C. Ch. 2506.

### IV. The Scope of the 1980 Authorization

{¶110} Having determined that the noise resolution was reviewable by the court of common pleas, I now consider the scope of the 1980 authorization within the context of both the noise resolution and the tent resolution.

{¶111} "'A question of statutory construction presents an issue of law that we determine de novo on appeal.'" *Cleveland Clinic Found. v. Bd. of Zoning Appeals*, 2014-Ohio-4809, ¶ 25, citing *Lang v. Ohio Dept. of Job and Family Servs.*, 2012-Ohio-5366, ¶ 12. While the 1980 authorization itself is not a statute or ordinance (it is simply meeting minutes), we consider the authorization within the context of Paragraph 61.155 of the 1975 Zoning Ordinance as the 1980 authorization was granted in express reliance on this provision.

---

[8] I note that the commission's decision would not be final under R.C. 2506.01(C) as Section 101.3 of the Zoning Ordinance grants an appeal to city council, a higher administrative authority, and provides a right to a hearing on such appeal.

{¶112} The trial court found, "Under the 1980 authorization, [the estate] is and has been restricted to using its house and grounds for meetings and other occasions sponsored by groups other than the Junior League, of a non-commercial nature." In doing so, it relied on both the 1980 authorization and the plain language of Paragraph 61.155 of the 1975 Zoning Ordinance.

{¶113} The estate asserts that the trial court adopted "an unprecedented interpretation" of the 1980 approval as the 1980 approval "did not contain any limits on use, meaning that the categories encompassed in Zoning Ordinance §61.155 were not the only activities permitted." No ambiguity is asserted in the 1975 Zoning Ordinance.

{¶114} In the 1980 authorization, the commission expressly said that it was giving "its specific authorization *for the uses requested*." (Emphasis added.) The uses requested by the estate at the 1980 meeting were: (1) leasing a part of the guest wing to the Junior League for use as its headquarters, and (2) using other areas of the house and grounds "for meetings and other occasions sponsored by groups other than the Junior League." Thus, the estate fails to recognize that the 1980 authorization expressly authorized only these two specific uses.

{¶115} Further, when reading the 1980 approval together with the plain language of Paragraph 61.155 of the 1975 Zoning Ordinance, which pertains to "*private golf courses, lodges, clubs, country clubs, ridings clubs, polo clubs, tennis courts and the like*" (emphasis added), the only logical inference is that the groups contemplated in the 1980 approval are non-commercial groups, like the Junior League or private clubs or "the like," that require a membership or some other similar limiting restriction from the estate being open to the general public. This is further supported

by the 1980 variance exhibiting that the events held at the estate were only held by "sponsoring organizations" and the 1990 authorization from the commission allowing the estate to sell *limited* "memberships"—no more than 200—to "Peterloon Walks in the Garden," which would then allow those limited members to assemble on the grounds for the purpose of viewing the gardens.

{¶116} Consequently, it is clear that the 1980 authorization only granted the estate an exception to use the grounds for meetings or occasions sponsored by non-commercial groups, like the Junior League or private clubs, that require a membership or some other similar limiting restriction from the general public. It did not grant the estate an exception that would allow the grounds to be open to the general public for any non-commercial use.

{¶117} I would further note that, although the 1990 authorization for the garden walks references the estate being used as a place of assembly, it did not do so without limitation (it limited the use to 200 members). The Zoning Ordinance defines a "place of assembly" as:

> A facility, other than a school, place of worship or day care operation, where people gather to engage in recreation or instruction on a non-commercial basis, or which provides space on a non-commercial basis to the general public, *or only to members of the organization that owns or operates the facility*, for such social gatherings as meetings, *weddings*, sporting events, banquets, or public service programs. The term 'places of assembly' shall include, but not be limited to libraries, Sunday Schools and other facilities for religious instruction, *country clubs, and lodges* offering space for seminars and banquets.

(Emphasis added.)  Indian Hill Cod.Ord. 33.3.[9]

{¶118} Looking to the plain language of this definition, it is clear that the Zoning Ordinance differentiates between places of assembly open to the general public and places of assembly limited by a membership, and only the latter was requested and granted in 1990. *See also* Indian Hill Cod.Ord. 101.421(2) (specifically referencing a place of *public* assembly).  Looking to the record before this court, there is nothing to indicate that the estate was ever granted the authority to open its grounds as a place of assembly *to the general public*.  Rather, any authorization granted was always limited by membership or some other similar limiting restriction.

{¶119} For all the foregoing reasons, I would hold that the trial court correctly interpreted the 1980 approval as limiting the estate's use of its grounds to "meetings and other occasions sponsored by groups other than the Junior League, of a non-commercial nature."  Contrary to the majority's opinion, there is no legal basis to vacate this determination.

{¶120} Beyond that, the record established that, contrary to the 1980 authorization, the estate was allowing the grounds to be used by the general public for weddings or other occasions.  In other words, the estate was not limiting the use of its grounds to groups like the Junior League or private clubs, that require a membership or some other similar limiting restriction from the general public.  Therefore, the trial court's determination that the estate was not limiting the use of its grounds to weddings or other occasions "sponsored by groups" was supported by the record.

{¶121} Consequently, I would hold that this court need not reach the issue of whether the trial court correctly determined that the events held at the estate were

---

[9] Of note, this ordinance also restricts commercial use.

commercial in nature. I would note, however, that at the time of the proceedings below, the estate was hosting approximately 19 weddings a year and generating $155,000 in revenue from these events.

{¶122} Ultimately, a review of the plain language of Paragraph 61.155 of the 1975 Ordinance, the 1980 authorization, and the other historical authorizations included in the record restrict me from reaching a result that would allow the estate to open its grounds for use by the general public, for any type of event, including weddings, as no such authority was ever granted to the estate. Therefore, I would affirm the judgment of the trial court on this basis.

Please note:

The court has recorded its entry on the date of the release of this opinion.